IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| GREENTEX GREENHOUSES, BV, | ) | |
| | ) | |
| Plaintiff, | ) | 4:04CV3390 |
| | ) | |
| v. | ) | |
| | ) | |
| PONY EXPRESS GREENHOUSE, | ) | MEMORANDUM AND ORDER |
| | ) | |
| Defendant. | ) | |

Pursuant to the parties' consent, this case is pending before me for final disposition.[1] The complaint filed by the plaintiff, Greentex Greenhouses, BV ("Greentex") alleges a breach of contract claim against the defendant, Pony Express Greenhouse, LLC, ("Pony Express") to recover $378,818.40 in damages for unpaid labor and materials used in constructing the defendant's greenhouse.  See filing 23 (amended complaint); filing 60 (pretrial order), p. 4.  Pony Express filed a counterclaim to recover damages allegedly caused by Greentex' defective (or incomplete) greenhouse construction.  See filing 38 (counterclaim);  filing 60 (pretrial order), p. 4; filings 66 & 68 (defendant's designation and supplemental designation of specific damages).

The pretrial order entered on March 31, 2006 required the parties to deliver their trial briefs and proposed findings of fact and conclusions of law to the court at least five working days before the first day of trial.  Filing 60 (pretrial order),

---

[1] See filing 61, "Consent to Exercise of Jurisdiction by a United States Magistrate Judge and Order of Reference," and 28 U.S.C. § 636(c).

p. 6.  Trial was set to commence before the undersigned on May 15, 2006.  Filing 60 (pretrial order), p. 6.  The plaintiff timely filed proposed findings of fact and a trial brief, (filing 69 & 70); the defendant "waive[d] the submission of a pretrial brief, and proposed findings of facts and conclusions of law."  Filing 71 (defendant's waiver).

The case was tried on May 15-16, 2006.  Testimony and documentary evidence were received at trial.  At the close of the trial, the defendant requested leave to file a post-trial brief.  Since the defendant had been afforded an opportunity to present a brief to the court prior to trial, and had chosen not to, defendant's request to submit a post-trial brief was denied.  Accordingly, this case is fully submitted for final determination.

Upon consideration of the evidence and applicable law discussed hereafter, I find in favor of Greentex on its claim against Pony Express.  I further find against Pony Express on its counterclaim against Greentex.

Pursuant to Federal Rule of Civil Procedure 52, the following sets forth the findings of fact and conclusions of law which constitute the basis for this ruling.


SUBJECT MATTER JURISDICTION


Greentex Greenhouses BV is a foreign company with its principal place of business in Holland.  Pony Express Greenhouse, LLC is a Nebraska limited liability company, with its principal place of business in Gothenburg, Nebraska.  From the time of its

formation to date, all of the members of Pony Express have been Nebraska citizens.  The amount in controversy exceeds $75,000.  This court therefore has diversity subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a)(2).[2]

## FINDINGS OF FACT

Based on the credible evidence offered at trial, I find:

In February 2002, Randy Cruise, the president of CT Farms, Ltd., was attempting to attract investors for a startup business of raising and marketing hothouse tomatoes.  He therefore planned and delivered a business presentation to potential investors in Minden, Nebraska in mid-February 2002.  David Grams was present at the meeting.  Since October 2000, Grams had managed Plains Produce, Inc., a tomato greenhouse operation located near Minden, Nebraska.  Larry Gill and Michael Bacon also attended this presentation, and shortly thereafter, Larry Gill, his wife, and

---

[2] For the purposes of determining diversity federal jurisdiction, a limited liability company's citizenship is based on the citizenship of its members.  GMAC Commercial Credit LLC v. Dillard Dept. Stores, Inc., 357 F.3d 827, 828 (8th Cir. 2004) (citing Carden v. Arkoma Assocs., 494 U.S. 185, 195-96 (1990) (quoting Chapman v. Barney, 129 U.S. 677, 681 (1889)).  Plaintiff Greentex alleged that Pony Express is a Nebraska limited liability company with its principal place of business located in Nebraska.  These allegations are sufficient to allege the citizenship of a corporation, but not a limited liability company.

Though the defendant never challenged subject matter jurisdiction, with or without the consent of the parties, this court has the sua sponte obligation to determine its jurisdiction.  See Williams v. Rogers, 449 F.2d 513, 517-18 (8th Cir. 1971).  From the record before me, I find that the members of Pony Express were at all relevant times citizens of Nebraska.  Therefore complete diversity exists.

Bacon decided to invest in Cruise's proposed hothouse tomato business.

Gill met with Cruise in February 2002, and told Cruise that he wanted to enter into the proposed business venture with Cruise. Since raising tomatoes year-round in central Nebraska requires a greenhouse, Gill instructed Cruise to proceed with building a "turnkey" greenhouse operation.

At the time this oral agreement was made, Pony Express did not exist as a separate legal entity. However, in accordance with the instructions from Gill, Cruise began the planning and work to build a greenhouse. Since Gill had no prior experience with the business of growing tomatoes in a greenhouse and marketing the crop, Gill relied on Cruise to obtain bids and select a greenhouse builder, determine precisely what should be built, communicate with the builder, and supervise the construction process. CT Farms was authorized by Gill to secure any necessary permits for the building project. Gill also relied on Cruise to contract with a grower to produce the tomato crop and supervise the harvesting and marketing of the tomatoes. See exhibit 52, p. 39-40.

Cruise and Grams had previously worked with Greentex on the Minden, Nebraska greenhouse project. Having received Gill's commitment to invest in a new greenhouse project, Cruise began soliciting bids. Greentex submitted a construction bid to build the greenhouse, was selected by Cruise to build the greenhouse, and started building the greenhouse at or near the time Pony Express was formed.

The negotiated terms of the construction agreement between Greentex and Cruise were memorialized in a February 25, 2002 written contract (the "February 25, 2002 contract") signed by Ludo Von Boxem on behalf of Greentex, and Cruise and Grams on behalf of Plains Produce.  Though no relationship existed between CT Farms and Plains Produce, Cruise asked Grams to assist with the construction process and paid Grams $25,000 for his assistance.  Gill knew Grams was assisting Cruise with the greenhouse construction:  Grams was present at the February investor presentation attended by Gill, and a May 2002 meeting attended by representatives of Greentex, Cruise, Gill, and Bacon; went to the construction site at least twice a week; and Gill approved Grams' request to withdraw money from the Pony Express account to pay greenhouse construction expenses.  See exhibit 28.

Cruise was authorized by Gill to enter into the February 25, 2002 construction contract with Greentex.  Pursuant the initial verbal agreement between Cruise and Gill, Cruise was to "build a greenhouse" and deliver it to Gill.  Exhibit 52, p. 39-40.  Gill placed no limitations on Cruise's authority to enter into a greenhouse construction contract, other than that the price had to be "within reason," meaning between three and five million dollars.  Exhibit 52, p. 40-41.  Gill also placed no restrictions on Cruise concerning what kind of greenhouse should be constructed.  Exhibit 52, p. 41.

The February 25, 2002 contract provided that Greentex would be paid $3,585,000 for the "delivery and assembly of a greenhouse, a shading installation, a heating installation and an irrigation+electro system+other equipment in accordance with the following description."  Exhibit 1.  Though Greentex can  build "turn-key greenhouse projects," (exhibit 40), each greenhouse is

5

custom-built in accordance with a buyer's specific demands. Therefore, the description of precisely what Greentex was to build for the $3,585,000 contract price was identified in detail in the February 25, 2002 contract.

Neither Cruise nor Grams requested a bid from Greentex for building a "turnkey" greenhouse operation, and the February 25, 2002 contract did not provide for construction of a fully functioning greenhouse.  For example, the contract did not include construction of a boilerhouse.  During negotiations with Greentex on the construction contract and throughout the construction process, Cruise was consistently concerned with expenses.  Cruise initially believed Greentex' proposed bid for installing a boilerhouse was too high, and told Greentex he would locate another contractor for that portion of the project. Cruise also specified the type and quality of netting (gauze)[3] supplied for the project, but apparently decided to use another source to install the netting.  The February 25, 2002 contract specifically stated that "[i]nstallation of the gauze is NOT included.  Extra price for outside job, $42,500.00.  Inside, extra price of $52,500.00."  Exhibit 1, p. 3 (emphasis in original).

The startup financing of the greenhouse construction was provided by Cruise, who borrowed approximately $1.5 million dollars from Gothenburg State Bank.  Gill "informally" guaranteed this loan.  Gill and his wife ultimately financed the project through a combination of their personal finances, Tax Increment Financing (TIF), a Community Development Block Grant, an SBA loan, and a loan from "96" Ranches, Inc., a corporation owned by

---

[3]Netting or gauze is used to keep insects out of the greenhouse.

Gill and his wife as the majority stockholders.  Gill wrote a check to Cruise on May 1, 2002 in the amount of $1,957,654.12 so Cruise could pay off his loan with Gothenburg State Bank. Exhibit 9.

The greenhouse was built on land owned by "96" Ranches because the land was available and located close to the highway. The ground-breaking occurred in early March 2002, and the site preparation was performed with equipment owned by "96" Ranches and three others.  Construction of the greenhouse began in mid-March 2002.

Pony Express was formed on March 15, 2002, with Bacon and "96" Ranches as founding members.  See exhibit 2.  Pony Express' only business activity was growing and marketing tomatoes, and its only assets were the greenhouse and any growing or harvested crop.  Pony Express' funds were deposited in the Gothenburg State Bank, (see exhibit 4), and to facilitate payment of ongoing expenses during the construction process, Randy Cruise and his wife were both authorized to withdraw funds from Pony Express' bank account.  See e.g. exhibit 24, p. 4, 6, 10.  Cruise's signature authority on Pony Express accounts was not terminated until the beginning of 2004, after construction of the greenhouse was complete.

With respect to payment of construction costs, Cruise typically contacted Gill when money was owed to Greentex.  Gill then authorized a transfer of funds to CT Farms, and Cruise used those funds to pay Greentex.  See e.g. exhibit 31.  Occasionally, at Cruise's request, funds were wired directly from Pony Express' or "96" Ranches' account to Greentex.  See e.g. exhibit 24, p. 12, 21; exhibit 27, p.2.

7

On May 15, 2002, the February agreement between Gill and Cruise to begin building the greenhouse became a written contract between Pony Express (signed by Gill as its manager) and CT Farms, Ltd. (signed by Cruise as its president).  This contract stated that CT Farms, as contractor, was agreeing to build a "fully functioning" greenhouse for $3,840,000.  See exhibit 8 (the "CT Farms/Pony Express" contract).  The "CT Farms/Pony Express" contract further stated:

> The intent of the Agreement is for the Contractor to provide Owner with a fully functioning hydroponic greenhouse with state of the art equipment.  This would include the purchasing of start up materials and supplies and the initial planting of stock.  Owner is relying on Contractor to make recommendations to obtain proper equipment and supplies.

Exhibit 8, p.2 ("SECTION SIX").  Greentex was not a party to this contract, and never agreed to be bound by its terms, including the contract price for building a "fully functional" greenhouse.

It is apparent from the language of the CT Farms/Pony Express contract that both Cruise and Gill knew the accepted construction bid from Greentex did not include all the equipment needed to have an operational facility.  The CT Farms/Pony Express contract stated:

> Contractor shall . . . [act] as general contractor for the erection of a 10-acre greenhouse and agricultural production facility with head house on the owners site. Included in the cost is the full cost of the greenhouse from Greentex, erected on the site, *and obtaining bids for all other needed equipment* and supervising the work to have the facility up and operating.

Exhibit 8, p.1 ("SECTION TWO")(emphasis added).

8

During the construction process, Gill met with Cruise at the construction site about twice a month, and he also met with Ludo van Boxem, International Sales Director for Greentex, and with other representatives of Greentex. As the construction continued, Cruise asked Greentex to construct and/or install items not included in the February 25, 2002 contract, including the boiler house. Consistent with these requests, Greentex performed the following construction which was not included in the February 25, 2002 contract: 1) installing a boiler house at the cost of $450,000.00; 2) mounting and delivering a silo measurement at a cost of $7,047.20; 3) increasing the chimney height from 10 meters to 18 meters at a cost of $22,137.50; 4) installing a burner that operated on gas and oil at a cost of $6,796.50; 5) hanging gutters at a cost of $14,971.10; 6) providing 100 meters of Tricoflex 1" at a cost of $310.50; 7) providing 12 pieces of GK coupling at the cost of $55.60; and 8) mounting the outside netting at the cost of $42,500.00. See exhibit 11. All of these costs were approved by Cruise, and at least some were approved in writing. For example, Grams, acting in the capacity of assisting Cruise in constructing Pony Express' greenhouse, accepted Greentex' bid for building the boiler house, (exhibit 25), and the amended construction contract between Greentex and Pony Express (signed by Cruise as Pony Express' project manager), noted payment guidelines for the "outside installation" of the bug screen. Exhibit 26.

Gill directed and authorized Cruise to build a greenhouse, and this authority was later memorialized in the written contract between Pony Express and CT Farms. Cruise was not required to first seek Gill's approval before asking Greentex to perform additional construction not listed in the February 25, 2002

9

contract.  Gill thereby authorized Cruise to act on Pony Express' behalf in contracting with Greentex for not only the construction of the greenhouse as set forth in the February 25, 2002 contract, but also those additional construction items requested by Cruise thereafter as listed above.

The fair and reasonable cost of the greenhouse construction, including Cruise's requested additions to the February 25, 2002 contract, was $4,128,818.40.  Greentex was paid $3,750,000.  Greentex billed Pony Express for the $378,818.40 still owed, but Pony Express has refused to pay this bill.[4]

Pony Express has filed a counterclaim alleging the greenhouse construction was defective or incomplete, and it was thereby damaged.  Of the listed defects, many are for failing to install certain items allegedly needed for a "turnkey greenhouse."  For example, Pony Express alleges Greentex failed to install insulation curtains on the side of the greenhouse, cooling equipment for the pack house in summer months, circulation fans and wiring for the pack house, sulfur pots to control disease, wiring for the sulfur pots, insulation on the oil tank and pipes, and appropriate waste water disposal equipment.  Pony Express also alleges Greentex failed to recognize that the irrigation well servicing the site property could not fully supply the water needs for both plants and personnel at the plant, thereby requiring Pony Express to drill and equip an extra well.  However, Greentex did not agree to

---

[4]Exhibit 42 was received into evidence, but I find it is irrelevant.  Based on the credible testimony, I conclude Exhibit 42 was presented by Greentex to Pony Express as a settlement offer.  Under Rule 408 of the Federal Rules of Evidence, evidence of offers to settle are not relevant or admissible to prove the amount of damages owed on a disputed claim.

build a turnkey greenhouse, and it did not agree to advise Pony Express concerning the equipment needed for the project or the adequacy of the building site.  Greentex built what Cruise asked it to build on the property location selected by Gill.

Pony Express also claims Greentex defectively constructed or used substandard materials for the center drains, gutters, boiler and its accessories, $CO_2$ machines, concrete piers, grading between the greenhouse and the pack house, heat pipes for the fertilizer room, and insect screens.  There is no credible evidence that these items were not built as requested or that they were defectively installed.  For example, as to the insect screen, Cruise identified the type of gauze or netting to be installed on the outside of the greenhouse.  The screen chosen was a low-cost, and therefore low-quality, insect screen--one that was expected to last only two to three years.  Cruise never requested inside installation of the screen, and only requested outside installation as an addition to the original contract.  As expected, holes developed in the screen about two to three years after it was installed.  This result was due to the materials chosen by Cruise and not any defect in the product, workmanship, or construction provided by Greentex.

Other items listed, such as the plan tray gutters and heating pipes in the fertilizer room, were repaired by Greentex, perhaps without any contractual obligation to do so.  There is no credible evidence that following the repairs, the installation or material quality of these items failed to meet the standards required under the construction contract.

There is also no credible evidence concerning the amount of damage caused by these alleged construction defects.[5]

## CONCLUSIONS OF LAW

The parties have stipulated, and the facts at trial established, that Randy Cruise or CT Farms, Ltd. contracted with Plaintiff Greentex for the construction of a greenhouse facility near Gothenburg, Nebraska for Pony Express. Filing 60 (pretrial order), uncontroverted facts ¶ 8. The primary issue in this case is whether Cruise and Grams were acting as the agents of Pony Express when they entered in the contract for delivery and construction of the greenhouse, and when they requested additional construction not included in the February 25, 2002 contract, such that Pony Express is now contractually obligated to pay Greentex for construction amounts remaining unpaid. Filing 60 (pretrial order), controverted issues ¶ 1. I conclude Cruise was acting as the agent of Pony Express, and in his

---

[5]Though the alleged defects have existed since the greenhouse construction was complete, which was no later than the spring of 2003, many were never mentioned to Greentex until it filed this lawsuit. "[A]n express or implied acceptance of work as in compliance with a building contract operates as a waiver of defective performance." Lindsay Mfg. Co. v. Universal Surety Co., 246 Neb. 495, 508, 519 N.W.2d 530, 540 (1994). Moreover, Pony Express made no listing of alleged damage amounts until less than two months before trial; Pony Express' witness on the issue of damages was not qualified to testify concerning the fair and reasonable cost of the repairs; the repair costs were valued at today's cost for items Pony Express has used for over three years; and many of the proposed repairs would serve to replace three-year-old equipment with new equipment, thus extending the function of these items beyond their anticipated life span, which becomes particularly important for those requested repairs which would essentially replace low-quality items chosen by Cruise with higher quality, and more expensive, materials.

capacity of assisting Cruise with that construction, Grams was also an agent for Pony Express.

"Whether an agency relationship exists depends on the facts underlying the relationship of the parties irrespective of the words or terminology used by the parties to characterize or describe their relationship." Medlin, 270 Neb. at 418-419, 703 N.W.2d at 597. "[A] fact finder must consider the facts and circumstances of the case, the parties' relationship, their usual course of dealing, any instructions given, the parties' conduct, and the nature of the transaction. Medlin, 270 Neb. at 419, 703 N.W.2d at 597. The question of agency, that is, the authority of one person to speak or act for and bind another, is a question of fact, and there is no presumption of its existence. Wagoun v. Chicago, B. & Q.R. R., 155 Neb. 132, 50 N.W.2d 810 (1952); Meier v. Geldis, 148 Neb. 234, 26 N.W.2d 813 (1947).

Gill delegated to Cruise all decision-making concerning who to contract with for the construction, the building plans for the greenhouse, the price to pay, and what items and accessories to purchase through Greentex. Pony Express placed no limits on Cruise's discretion concerning how the build the greenhouse, and did not require Pony Express to pre-approve contract provisions or expenditures for completion of the project. Cruise had check-writing authority on Pony Express' account, and money request made by Grams were ultimately approved by Gill. Though Cruise was not employed by Pony Express, he was Pony Express' agent for the purpose of the greenhouse construction. To the extent Grams was assisting Cruise in performing his agency responsibilities for Pony Express, Grams was also the agent of Pony Express.

Moreover, although Greentex usually dealt directly with Cruise, it was aware that the project was being performed by Cruise for Pony Express, and that Grams was assisting Cruise. Gill was aware that Cruise and Grams were both making decisions regarding how the construction would be accomplished, and that Greentex was acting on those decisions. Gill was present with Grams and Cruise at a meeting with Greentex to discuss the project. When Greentex requested payment for construction bills, payments were made at either Cruise's direction, Grams' direction, or directly from Pony Express to Greentex. Pony Express never advised Greentex that either Cruise's or Gram's authority to make construction decisions or modify prior contract terms on Pony Express' behalf was limited in any way.

A principal is bound by, and liable for, the acts an agent was actually or apparently authorized to perform. Dept. of Banking & Finance of State of Neb. v. Davis, 227 Neb. 172, 178, 416 N.W.2d 566, 570 (1987). Apparent authority is the authority an agent "seems to have by reason of the authority he actually has." Id. A party who has knowingly permitted others to treat someone as its agent is estopped to deny the agency. Id. With respect to the greenhouse construction items at issue in this case, the facts of this case prove that both Cruise and Grams were acting as the authorized agents of Pony Express or, at the very least, the apparent agents of Pony Express.

Greentex claims Pony Express, acting through Cruise and Grams, breached its contract with Greentex by failing to pay certain amounts owed under the construction contract. "In order to recover in an action for breach of contract, the plaintiff must plead and prove the existence of a promise, its breach, damage, and compliance with any conditions precedent that

activate the defendant's duty." Henriksen v. Gleason, 263 Neb. 840, 847, 643 N.W.2d 652, 658 (2002).

A contract existed between Greentex and Pony Express; Cruise, acting under the express or apparent authority of Pony Express entered into a contract to build a greenhouse, and later modified that contract to request additional construction. Greentex fully performed the contract.  There is no credible evidence that Pony Express did not receive what it agreed to pay for in the construction contract.  Although Pony Express claims it contracted for a "turnkey greenhouse," and Greentex failed to provide such a greenhouse, the contract for a turnkey greenhouse (if it existed at all) existed between Pony Express and Cruise. Cruise was to build a "fully functioning" greenhouse under the construction contract with Greentex and by obtaining additional "bids for all other needed equipment."  Exhibit 8.  If Cruise failed to do so, Pony Express' claim is against Cruise who made the promise, and not Greentex, which was never asked to and therefore did not promise to build a "turnkey greenhouse."

Though Greentex performed the construction contract, Pony Express has refused to pay for part of the amounts owed.  Pony Express has breached the contract and thereby damaged Greentex in an amount totaling $378,818.40.  Greentex is entitled to judgment in that amount on its claim against Pony Express.

Pony Express' counterclaim alleges that Greentex failed to provided many items required for a turnkey greenhouse, and other items provided were incorrectly built or made of substandard materials.  Pony Express therefore claims the greenhouse building is defective and Greentex must pay damages to remedy these defects.  "Where a construction contract is substantially

performed, the damage which the owner suffers because of defective workmanship or unsuitable materials used is measured by the reasonable cost of remedying the defects." Henggeler v. Jindra, 191 Neb. 317, 319, 214 N.W.2d 925, 926 (1974). Pony Express had the burden of proving the existence of construction defects and the cost of remedying those defects. Nathan Const. Co. v. Fenestra, Inc., 409 F.2d 134, 141 (8th Cir. 1969) (interpreting Nebraska law and citing Rickertsen v. Carskadon, 172 Neb. 46, 108 N.W.2d 392, 396 (1961)). Pony Express failed to meet this burden of proof, and cannot recover against Greentex on its counterclaim.

IT THEREFORE HEREBY IS ORDERED:

a.  Greentex is entitled to a judgment in its favor and against Pony Express in the amount of $378,818.40.

b.  Pony Express has failed to prove any right to recover on its counterclaim against Greentex.

c.  Judgment will be entered accordingly.

Dated this 16th day of June, 2006.

> BY THE COURT:
>
> s/ *David L. Piester*
> David L. Piester
> United States Magistrate Judge